United States District Court for the Southern District of New York

| | | |
|---|---|---|
| **John Keith Blakely, Rhonda L. Blakely** | ) | Civil Action No. |
| **Estates of John E. Long and Virginia E. Long,** | ) | 13 Civ 2140 |
| | ) | |
| **Plaintiffs,** | ) | |
| -v- | ) | |
| | ) | **COMPLAINT** |
| **Jacob E. Lew, Secretary of the U.S. Department** | ) | |
| **of Treasury; Steven T. Miller, Acting Commissioner** | ) | |
| **of the U.S. Internal Revenue Service, in their** | ) | Hon. Jesse M. Furman, J. |
| **official capacities,** | ) | Hon. Gabriel W. Gorenstein, |
| | ) | M. J. |
| **Defendants.** | ) | |
| | ) | |

---

Preliminary Statement

1. This action seeks a writ of mandamus against the Commissioner of the Internal Revenue Service and Secretary of the Treasury directing them to (a) credit approximately four million dollars in assets tendered to the IRS to pay off a tax liability as tax payments instead of treating them as gifts to Treasury agents and agencies, (b) to acknowledge receipt of, and deliver to appropriate persons in the IRS for consideration, the attached eighty-page amended refund claims that have been filed repeatedly since April 2, 2002 but have twice been declared "lost or misplaced," and (c) to divulge the contents of a formal review conducted by Associate IRS Division Counsel Martin Needle at the request of the Deputy Attorney General of the United States regarding IRS obligations to pay the refund claims.

2. IRS attempts to convert Plaintiffs' tax payments tendered by consent judgment on September 25, 1992 ("the initial payment") into an inappropriate gift to its agents began when extremists, who are no longer with the Department of Justice

Assets Forfeiture and Money Laundering Section ("AFMLS"), persuaded IRS counsel to defy their agency's published policy and divert the assets to AFMLS for redistribution back to treasury agents and agencies.  AFMLS initially claimed, falsely, that the entire four million dollars could be forfeited and distributed to agents because every cash bank deposit of Country Folk Art Shows gate receipts over a four-year period consisted of "structured assets."  After the original trial judge vacated the currency structuring convictions that had been procured by guilty pleas elicited under false pretenses the government voluntarily dismissed all currency structuring charges.  See opinions and orders contained in Plaintiffs' Appendix filed with this Complaint ("APX") at pages 58-63 (top center numbering).

3.  Further litigation was then conducted to determine by which route money should be returned to Plaintiffs.  The Sixth Circuit Court of Appeals determined on January 11, 2002 that tax refunds pursuant to 26 U.S.C. § 7422 were the proper avenue because Plaintiffs had filed a lengthy refund demand letter on August 21, 1994 with the IRS, which sufficed to establish the timeliness of claims under *United States v. Kales,* 314 U.S. 186, 194 (1941).  However, the Court of Appeals also determined that the refund claims needed to be amended in various ways; the amended refund claims filed on April 2, 2002 and attempts by various IRS counsel to make them disappear without any response are the subject of the instant lawsuit.  *See* footnote 9 of opinion (APX at 75).

4. Following a couple years of inaction Attorney General Ashcroft and Deputy Attorney General Comey assigned Associate Deputy Attorney General Catherine O'Neil to review the matter and request action on the refund claims from the IRS.  She

completed this assignment on July 25, 2005 with a letter to IRS Criminal Investigations Chief Nancy Jardini (APX 84-85), who arranged for the Martin Needle review to be done but took no further action because Criminal Investigations did not have jurisdiction to grant refund claims (APX 86).  Since that time the amended refund claims have been lost of misplaced in a variety of ways and have not shown up in IRS computers.  The undersigned has been advised that until the Commissioner of the IRS acknowledges the tendered assets as a receipt of tax payments no lawsuit to compel payment of a refund can succeed.

Jurisdiction and Venue

5.  Federal subject matter jurisdiction exists for this action pursuant to 28 U.S.C. § 1331 because the Mandamus and Venue Act, 28 U.S.C. § 1361, grants every United States district court in the nation jurisdiction to litigate an action seeking issuance of writs of mandamus against federal officers where plaintiffs have made nonfrivolous allegations that they have an absolute right to relief that has been denied them by the federal officers' refusal to perform a mandatory or ministerial duty.

6.  Plaintiffs in the instant case have an absolute right under I.R.C. § 6402 to tax refunds sought in their April 2, 2002 amended refund claims because the Internal Revenue Service's decision to collect the same taxes, interest and penalties twice and not return the excess payment has caused an overpayment that must be refunded under § 6402.  Plaintiffs also have an absolute right to an Order compelling the Commissioner to credit the assets taken by consent judgment on September 25, 1992 as tax payments made *nunc pro tunc* because the IRS has consistently taken the position that without such an Order from the Commissioner Plaintiffs cannot

successfully prosecute a civil action for tax refunds under 26 U.S.C. §7422 because mere conversion or unlawful taking of assets by IRS agents does not constitute receipt of a tax payment unless acknowledged as such by the Commissioner.

      7.   Under 28 U.S.C. § 1391(e)(1)(B) venue is proper in any district where "a substantial part of the events or omissions giving rise to the claim occurred." Plaintiffs' refund claims have been handled from the outset by the undersigned who has had extensive phone and mail contact with various IRS and Justice Department personnel from each of his two offices. One of these offices, located at 1 Stuyvesant Oval 8D, New York, New York, is within the territorial boundaries of the United States District Court for the Southern District of New York. The triggering event that gave rise to the instant lawsuit consisted of communication from the Chief Counsel of the IRS delivered through his subordinate Douglas Hoffmaster on or about February 20, 2013 that despite the undersigned's submission of additional proof that IRS had no legitimate justification for keeping assets over and above those used to pay off liability for taxes, interest and penalties, the Commissioner would not reclassify the wrongfully taken assets as tax payments without a lawsuit being filed in federal court. (See APX at 97 re transmission of additional copy of refund claims to IRS Chief Counsel). Mr. Hoffmaster's final communication to the undersigned was made to his office in New York City.

Parties

      8.   Plaintiffs in this action are both the owners of all wrongfully retained assets that have given rise to the refund claims at issue in this case and the sole owners of Country Folk Art Shows, Inc., ("CFAS") the successful family enterprise that generated the income giving rise to the assets and tax liability that led to the September 25, 1992

consent judgment.  CFAS at the time was owned jointly by two couples consisting of parents John Emmet Long ("John Long") and Virginia E. Long ("Betty Long") and their daughter and son-in-law, Rhonda L. Blakely and John Keith Blakely ("Keith Blakely").  The annexed amended refund claims (APX 1-81) were filed by these four individuals in 2002.  Since that time John and Betty Long have passed away.  Hence this action continues to be prosecuted by Keith and Rhonda Blakely along with the Estates of John and Betty Long.

9. Both defendants have been sued in their official capacities.  Steven T. Miller is the current Acting Commissioner of the United States Internal Revenue Service and has overall responsibility for the conduct of business by the IRS and all its employees.  Jacob E. Lew is the current Secretary of the Treasury of the United States and has supervisory authority over the IRS including Commissioner Miller.  Secretary Lew is joined as an additional mandamus defendant in part because, according to persons in the Office of Deputy Attorney General, plaintiffs' wrongfully diverted assets have been distributed to Treasury Agents, not all of whom are believed to be employees of the IRS.

Factual Background

10. During the years 1988-1991 Plaintiffs accrued a tax liability to the United States Internal Revenue Service because John Emmett Long ("John Long") miscalculated taxes due on gate receipts from the operation of the family's closely held company, Country Folk Art Shows ("CFAS").  CFAS had recently and unexpectedly become a successful enterprise and at that time was operating without substantial oversight from a Certified Public Accountant.   John Long and other family owners of the

CFAS were attempting to offset receipts against the costs of purchasing a warehouse and web press, which took longer than anticipated to obtain.  As a result the owners wound up under-reporting income for several years in a row based on John's incorrect belief that it was possible to carry forward income if it were being used for a business purpose.  (APX 30-32.)

11.  Once plaintiffs' under-reporting was discovered they cooperated fully with the United States and quickly agreed to pay off the liability for taxes, interest and penalties calculated by the I.R.S., which had been given unimpeded access to all company and personal financial records.  (See APX 82-83 for summary of liability and proof that forfeited assets were not credited as tax payments.)  A competent, full-time accountant was also hired to handle the company's financial affairs.

12.  The United States, which acknowledged from the outset that all income of CFAS and its owners had been legally derived from conducting exhibitions of country folk art, chose to receive its first installment on the overall liability that exceeded five million dollars, by means of a September 25, 1992 consent judgment of forfeiture ("the consent judgment") (APX 52-27).  The consent judgment and its accompanying stipulations (APX 46-51) recited no facts other than that plaintiffs owned and agreed to forfeit several bank accounts, a house and other personal property, all of which were forfeited to the United States.  The overall value of this property was calculated to be near four million dollars in the September 29, 1992 Affidavit of I.R.S. Special Agent Gregory R. O'Connor, an amount that has never been disputed.  (See APX 64-71).

13.  Plaintiffs' consent to the forfeiture was elicited by telling them that these particular assets could be forfeited because they were involved in "structuring," but that

IRS policy required that any legally derived assets forfeited because of currency structuring had to be credited as payments toward tax liability. See Affidavit of J. Long, ¶¶ 9-22. (APX 22-29). This policy, which had come from a ruling by the then Assistant Commissioner and was published as part of the IRS Litigation Memorandum, was communicated to plaintiffs and used to obtain their consent to making their first installment payment in this manner. *Id.*, (APX 76-78). There was no discussion of, and Plaintiffs had no intention of offering, anything in the nature of a gift or bribe to IRS agents. See Affidavit of J. Long, ¶¶ 9-22, Affidavit of Keith Blakely, ¶¶ 6-23, Declaration of Jeffrey M. Blum, ¶¶ 4-11  (APX 22-29, 32-45).

14. During the two months after the consent judgment was signed the forfeited proceeds were transferred to the U.S. Department of Justice Assets Forfeiture and Money Laundering Section ("AFMLS"), which then distributed them back to Treasury agents and agencies. Extremists in AFMLS took the position that because actual currency structuring offenses committed in violation of 31 U.S.C. § 5324(a)(3) could provide an independent basis for forfeiture, the transfer of assets to AFMLS voided any controlling authority for the Assistant Commissioner's directive regarding forfeiture of legally derived assets involved in currency structuring. IRS officials were persuaded to adopt this approach and the same taxes, interest and penalties were assessed a second time. None of the forfeited assets was credited as anything other than a gift and/or forfeiture to the IRS. (APX 82-83).

15. When the Supreme Court decided *Ratzlaf v. United States,* 535 U.S. 135, 136 (1994)(clarifying that currency structuring law only prohibits "*break[ing] up a single [currency] transaction* above the [$10,000] reporting threshold into two or more separate

transactions for the purpose of evading a financial institution's [CTR] reporting requirement.") (Emphasis supplied.) Plaintiffs learned that the interpretation of the currency structuring law being propagated by AFMLS extremists was incorrect. It quickly became clear that Plaintiffs had not engaged in currency structuring because their repeated deposits of cash from gate receipts tendered by thousands of patrons in small bills did not constitute breaking up of any single transactions as defined in the controlling regulations, 31 CFR §§ 103.22, 103.63. All currency structuring convictions were then vacated by the original trial judge, the Hon. Stewart A. Newblatt, by an August 21, 1997 opinion that was formalized into a September 5, 1997 Order (APX 58-61).

16. In the wake of that decision Plaintiffs began seeking the return of forfeited assets and/or refund for overpayment of taxes through a variety of legal avenues. The timeliness of a tax refund lawsuit had been established by hand delivery of a 54-page refund demand letter on August 17,1994 (APX 41) within two years of both the Consent Judgement of Forfeiture and the ensuing imposition of the same taxes, interest and penalties a second time, which easily satisfied the requirements of an informal refund claim under the doctrine of *United States v. Kales*, 314 U.S. 186, 194 (1941) (informal claim must have "a written component," communicate that a refund is being sought and "furnish sufficient information to 'allow the IRS to make a reasonable and intelligent investigation and evaluation of the taxpayer's claim.'") (See APX 72-75, 91-96).

17. On January 11, 2002 the United States Court of Appeals for the Sixth Circuit issued its published opinion in *Blakely v. United States,* 276 F.3d 853 (6th Cir. 2002). The Sixth Circuit determined that Plaintiffs should obtain repayment through the vehicle

of tax refunds instead of other conceivable avenues. The Court of Appeals also ruled that Plaintiffs' 54-page refund demand letter was insufficient to invoke the jurisdiction of federal courts to order a tax refund, but that it would establish the timeliness of the claims once properly amended refund claims were filed. (APX 72-75, 91-96).

    18. On March 25, 2002 and April 3, 2002 the undersigned, who had been granted Power of Attorney by, and received all necessary signatures from, Plaintiffs filed with IRS Counsel and the IRS Service Center in Cincinnati, respectively (APX 41), the attached refund claims (APX 1-79). Following a period of inaction on the amended refund claims the undersigned spoke with regional counsel for the IRS Small Business and Self-Employed Division, Richard Witkowski, who explained that Plaintiffs could not successfully sue for a tax refund until the Commissioner of the IRS or some appropriate designee formally reclassified the retained assets as tendered tax payments. Witkowski explained that even if IRS agents appeared and collected money for themselves by pretending the money was to pay off tax liability, the taxpayers would not be entitled to a refund for having tendered the money unless an order was written by the Commissioner directing IRS staff to construe the tender as tax payments. *See* letter of Deputy Commissioner Kevin M. Brown dated January 16, 2007 confirming that form 843 titled "Claim for Refund and Request for Abatement" cannot be used to secure return of forfeited assets absent reclassification letter (APX 87). An Order from the District Court directing the Commissioner to locate and acknowledge Plaintiffs' amended tax refund claims and prepare an order directing IRS staff to classify Plaintiffs' tender of assets on September 25, 1992 as tax payments is the primary relief sought in the instant lawsuit.

19. After two years of IRS inaction on the amended refund claims and various letters to Department of Justice personnel the undersigned counsel received a telephone call from Counsel to then Attorney General John Ashcroft who explained that the Deputy Attorney General, acting through one of his Associate Deputies Attorney General, would conduct a review of the improper forfeiture and most likely assist in getting the IRS to provide an appropriate refund.  The review began in the late summer of 2004 and was conducted by Associate Deputy Attorney General Catherine O'Neil, who solicited extensive correspondence and documentation from the undersigned and had repeated telephone conversations with him, most of which centered on the factual question of whether there had been any independent basis for the government to retain assets over and above the amount needed to satisfy Plaintiffs' tax liability.

20. Associate Deputy Attorney General O'Neil concluded her review on July 25, 2005, shortly before she and Deputy Attorney General Comey left office.  The review generated two similarly worded letters to the undersigned and to IRS Criminal Invesigations Chief, Nancy Jardini.  The letter to Jardini concluded that "in considering this case, this office has been mindful of the fact that the factual basis for the forfeiture appears to be closely linked with the facts underlying the $5.3 million tax liability of the taxpayers. . .  I am writing to suggest that your office undertake its own review of the facts of the pending refund claim and render a decision."  The letter requested that the IRS Criminal Investigations Division have its own counsel review the matter to confirm that there was no independent factual basis for retaining assets over and above the payment of tax liability and that it then "render a decision" on Plaintiffs' pending refund claims. (APX 84-85).

21. Shortly after July 25, 2005 Deputy Attorney General Comey and his Associate Deputy Attorneys General followed Attorney General Ashcroft's lead and resigned their positions in the Justice Department. Since that time the Justice Department has taken the position that the processing of refund claims is the responsibility of the IRS and that no further involvement of the Justice Department is needed.

22. In response to the July 25 letter Chief Jardini had Associate Division Counsel Martin Needle prepare a review, which he assured the undersigned would kept in IRS files until the matter was resolved. Associate Division Counsel Needle's review was completed during or about December, 2005; however, Division Counsel Edward G. ("Ted") Cronin subsequently refused to divulge its contents, citing attorney-client privilege as the legal ground for the refusal. Chief Jardini, whose branch of the IRS had initiated the forfeiture, responded by sending the attached letter dated December 8, 2005 in which she concluded "that Internal Revenue Service-Criminal Investigation (CI) does not have jurisdiction regarding these claims." (APX 86). Jardini's response was technically correct in that the appropriate division of IRS for processing the refund claims was the Small Business and Self-Employed Division ("SBSE"), not Criminal Investigations. Nevertheless, the IRS continued diverting all communications regarding the refund claims to the Criminal Investigations branch and its Division Counsel, despite Counsel's concurrence that it did not have jurisdiction over the matter.

23. The undersigned's ensuing efforts to communicate with the IRS Commissioner, the Deputy Commissioner and Office of Chief Counsel were time-consuming and generated little progress or contact with relevant decision makers. No

response to, or letter of disallowance for, the attached refund claims was ever received. On two occasions lower level IRS personnel conducted searches and reported that the refund claims had never been processed and appeared to have been lost because there was no record of them in IRS computers. The Treasury Inspector General for Tax Administration ("TIGTA") investigated the disappearance of the claims but reported that it had no authority to intervene substantively in the handling of refund claims.

24. The most illuminating response came from IRS Deputy Commissioner for Services and Enforcement Kevin M. Brown on January 16, 2007. It stated: "The forfeiture action involving John and Virginia Long and John and Rhonda Blakely has been litigated through Federal District Court and the Court of Appeals, and has been decided by them. . . Accordingly, there is no further action to be taken by the Internal Revenue Service." (APX 87). Deputy Commissioner Brown's response revealed a fundamental misunderstanding of the nature of the September 25, 1992 Consent Judgment, which in reality had simply tendered assets to the United States, but recited no findings of fact as to whether the assets were being taken as partial payment of the agreed upon tax liability. See ¶ 13, *supra*, and documents cited therein. IRS representations at the time had left Plaintiffs with no reason to doubt that the assets would be so credited. *Id.*

25. To correct Deputy Commissioner Brown's confusion, which apparently was leading him to believe that the judgment had authorized retention of forfeited assets over and above payment of the tax liability, the undersigned initiated an additional round of litigation in the District Court and Sixth Circuit Court of Appeals. The only theory by which the government could claim it was entitled to retain the assets over and above

12

payment of tax liability involved rejecting the reviews done by Associate Deputy Attorney General O'Neil and Associate Division Counsel Martin Needle and returning to position advocated by AFMLS extremists prior to 2004–which was that all assets could be forfeited because all CFAS cash bank deposits (some of which exceeded $10,000 and many of which had CTRs filed) were "structured transactions." On August 6, 2008 the Sixth Circuit Court of Appeals directly repudiated this theory by making clear that the judgment of forfeiture had not been based on the assets' involvement in structured transactions. A motions panel wrote that Movant-Appellants (Plaintiffs herein)

> now move to supplement the record on appeal by requiring the government to file with the court a list of structured transactions. No such list was filed in the district court, and the court did not consider a list of structured transactions in ruling on the appellants' motion to vacate. The government opposes the motion to supplement the record. . . As noted by the court in denying appellants' motion for a limited remand, a list of structured transactions will not assist the court in its consideration of the issue on appeal.

(APX 88-89).

26. Following an additional two years of attempts to reach Commissioner Schulman, who may or may not be aware of this action, the undersigned was able to establish a type of limited indirect contact with the Chief Counsel of the IRS. Such counsel, who apparently communicated with and ostensibly has provided his office's final response through its employee Douglas Hoffmaster (see APX 97), seems to have determined that the IRS would take no action until a mandamus suit were filed against the Commissioner to compel him to acknowledge the forfeited assets as payments that should have been credited toward tax liability.

27. The undersigned's communications with Hoffmaster, which began in November, 2012 and included the sending of yet another copy of the amended refund

claims on November 28, 2012 (APX 97), reached a conclusion during the week of February 18, 2013 when Hoffmaster telephoned and spoke with the undersigned in his New York office.  Mr. Hoffmaster stated that the mandamus action should be filed now and he responded affirmatively to the undersigned's question as to whether the chief counsel has signed off on that decision.

<u>As and for a First Cause of Action: for a Writ of Mandamus Pursuant to 28 U.S.C. § 1361 Directing Defendants to Issue an Order Crediting the Value of Plaintiffs' Forfeited Assets as Tax Payments Made to the Government on September 25, 1992.</u>

28.  Plaintiffs repeat and re-allege paragraphs 6-7, 10-20 and 25-27 as though fully set forth herein.

29.  The three legal requirements for the granting of a petition for writ of mandamus are that plaintiffs have a clear right to the relief sought, that defendants have a clearly defined and peremptory duty to perform the act or acts for which a writ is sought, and that plaintiffs have no other adequate remedy available.

30.  When assets are tendered to the United States to pay off a tax liability, as was understood by Plaintiffs on September 25, 1992 and required by IRS policy at the time, Defendants, who have overall responsibility for the conduct of IRS employees, have a mandatory duty to credit the assets tendered as payments made to reduce such liability.  Plaintiffs likewise have a clear right to have their tender of assets credited as payments toward their tax liability.  Plaintiffs' rights were violated when their assets were taken without being credited as tax payments because there was never any legal justification for retaining assets over and above the undisputed amount of taxes, interest and penalties due under the Internal Revenue Code.

31.  By collecting money and other valuable assets for taxes, interest and penalties through a September 25, 1992 consent judgment and then refusing to credit the tendered assets as proffered tax payments the United States forced plaintiffs to make an overpayment of taxes, as defined in I.R.C. § 6402.  Plaintiffs have an absolute right to a tax refund in an amount established by the Internal Revenue Code on this overpayment.  Defendants' continuing refusal to credit the forfeited assets as tax payments has blocked Plaintiffs from being able to obtain the refund to which they are entitled by law.  The I.R.S. has consistently refused to process the long-pending refund claims administratively and takes the position that no lawsuit for a tax refund can succeed because even assets admittedly stolen by I.R.S. agents will not entitle the owner to a tax refund unless and until Defendants, acting either personally or though an appropriate designee, order that Plaintiffs' tendered assets be classified as tax payments.

<u>As and for a Second Cause of Action: for a Writ of Mandamus Pursuant to 28 U.S.C. § 1361 Directing Defendants to Address Plaintiffs' Refund Claims in Good  Faith, Either by Having an Appropriate Person within the IRS Process them in Accordance with I.R.C. Requirements Administratively or by Showing Cause in this Court Why Genuine Issues Exist that Should Necessitate the Filing of an Additional Refund Lawsuit Pursuant to 26 U.S.C. § 7422(a).</u>

32.  Plaintiffs repeat and re-allege paragraphs 10-27 as though fully set forth herein.

33.  Since Plaintiffs' amended refund claims were filed with the I.R.S. during March-April 2002 the U.S. Internal Revenue Service has stonewalled, delayed and

evaded its clear obligation to provide the refunds required by the Internal Revenue Code.  The IRS has issued no notice of disallowance as would be required to reject refund claims administratively.  Rather, various counsel within the Service, most of whom have been in a division not authorized to address refund claims, have simply written letters stating that their division intended to take no action on the claims.  IRS stonewalling has continued even after a specific request for a decision on refund claims was made by the Deputy Attorney General of the United States.

34.  Even though the Internal Revenue Code contains no specific deadline by which refund claims must be addressed administratively, in cases where delay and evasiveness have become extreme and unduly burdensome courts have granted or expressed an intention to grant writs of mandamus to compel the IRS to address the refund claims in good faith, either administratively or by setting forth legitimate grounds for disputing the claims in the mandamus action.  *See, e.g., Estate of Mansy Y. Michael v. Lullo,* 173 F.3d 503, 513 (4th Cir. 1998); *In Re First Federal Savings and Loan of Durham v. Baker*, 860 F.2d 135, 139-140 (4th Cir. 1988); *Vishnevsky v. United States,* 581 F.2d 1249, 1255 (7th Cir. 1978).  In *First Federal Savings and Loan* the Fourth Circuit directed the district court that "if the facts relating to the refund amount have been ascertained, it should order the Secretary to pay the taxpayer that amount.  If calculations which are solely mechanical are necessary, the court should order that to be done."  860 F.2d at 140.

<u>As and for a Third Cause of Action: for a Writ of Mandamus Pursuant to 28 U.S.C. §1361 Directing Defendants to Disclose the Formal Written Review Prepared by Associate Division Counsel Martin Needle at the Request of the Deputy Attorney</u>

General and IRS Criminal Investigations Chief.

35. Plaintiffs repeat and re-allege paragraphs 19-24 as though fully set forth herein.

36. On information and belief, since December 2005 the IRS has had in its files reliable information prepared by its own Associate Division Counsel confirming that tax refunds are owed to Plaintiffs. The United States, acting through various IRS counsel, has sought to feign ignorance and pretend that it was entitled to retain forfeited assets and provide no refund. It has done this by concealing and pretending not to know about the review prepared by Associate Division Counsel Martin Needle.

37. The United States and IRS, acting through Division Counsel Edward Cronin, have cited "attorney-client privilege" as their sole justification for refusing to divulge Mr. Needle's review. Reliance on attorney-client privilege for refusing to divulge a review prepared at the request of the Deputy Attorney General is misplaced for two reasons. First, because the IRS has an overriding duty to the government and the public to calculate amounts that are due honestly and correctly, information needed to correct errors that have been made is not properly subject to attorney-client privilege. Second, even if the privilege did apply, in this case the Needle review would come within the crime-fraud exception to attorney-client privilege because of its importance for exposing an ongoing fraudulent attempt to retain assets to which the government is not entitled by law.

## Prayer for Relief

Plaintiffs hereby seek three orders from the district court compelling Defendants to (1) credit the value of Plaintiffs' assets forfeited in the consent judgment of

September 25, 1992 as tax payments made to the United States on September 25, 1992, (2) address in good faith, either administratively or within the current mandamus action, and with due regard to the requirements of the Internal Revenue Code, Plaintiffs' amended refund claims filed in March-April, 2002, and (3) disclose the formal written review of Plaintiffs' consent judgment of forfeiture and pending refund claims prepared by Associate Division Counsel Martin Needle pursuant to the July 25, 2005 request of the Deputy Attorney General of the United States.

    Plaintiffs further seek reimbursement for the costs of bringing this action, including attorneys' fees to the extent allowed by law, and such other and further relief as the Court deems just and proper.

                                        Respectfully Yours,

                                        /s/ Jeffrey M. Blum

                                        Jeffrey M. Blum
                                        Counsel for Plaintiffs
                                        1 Stuyvesant Oval 8D
                                        New York, New York 10009
                                        Phone (502) 494-2889
                                        Email jmblum@hotmail.com